# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3167

_____

|  |  |  |
|---|---|---|
| Nathan Smutka, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| City of Hutchinson; Hutchinson | * | Appeal from the United States |
| Utilities Commission, municipal | * | District Court for the |
| corporations; Paul Ackland; Craig | * | District of Minnesota. |
| Lenz; Donald Walser; David | * | |
| Wetterling; Marc Sebora; | * | |
| Patrick Spethman, each in their | * | |
| individual capacity, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 16, 2006
Filed: June 23, 2006

_____

Before MURPHY, BOWMAN, and BENTON, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Nathan Smutka sued the City of Hutchinson; the Hutchinson Utilities Commission (HUC); HUC Commissioners Paul Ackland, Craig Lenz, Donald Walser, and David Wetterling; City Attorney Marc Sebora; and HUC Business Manager Patrick Spethman (collectively, the defendants) alleging that the defendants violated

Smutka's procedural-due-process rights when HUC terminated his employment.[1] The District Court[2] granted summary judgment to the defendants. Smutka appeals and we affirm.

## I.

Smutka began working for HUC on April 1, 1969, and worked continuously for HUC until his employment was terminated on November 4, 2002. The events surrounding the termination spawned this litigation. At the time of the termination, Smutka was HUC's Metering Supervisor, his supervisor was Jan Sifferath, and his second-level supervisor was Spethman. Clarence Kadrmas was HUC's General Manager. In 2000, Kadrmas hired Spethman as HUC's Business Manager, and Spethman became Smutka's supervisor. Before that, Smutka reported directly to Kadrmas. Sifferath was not hired until May 2002, at which time she became Smutka's immediate supervisor. Smutka always enjoyed a good working relationship with Kadrmas. The same could not be said about Smutka's working relationship with Spethman. From the beginning, Smutka and Spethman did not get along.

In November 2000, shortly after arriving at HUC, Spethman determined that Smutka had used his work computer to view pornography. When confronted, Smutka denied the charge. As a result of this incident, Kadrmas instructed Spethman to suspend Smutka with pay for five days and place him on one year of probation.

---

[1]Smutka also alleged violations of his substantive-due-process rights, the Minnesota Human Rights Act, Minn. Stat. § 363.03 (2002) (subsequently renumbered under Minn. Stat. ch. 363A), Minnesota's dismissal for age statute, id. § 181.81, and the Minnesota Public Employee Labor Relations Act, id. § 179A.13. The District Court granted summary judgment to the defendants on these claims. Smutka does not appeal that part of the decision.

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Smutka did not violate other work rules during his probation. Nevertheless, Spethman disagreed with the discipline for the pornography incident, believing that Smutka's employment should have been terminated. The relationship between Spethman and Smutka became even rockier after the pornography incident. Smutka believed that Spethman wanted, and tried, to terminate Smutka's employment after this incident and worked to undermine Smutka's workplace status.

In the fall of 2002, Spethman made a business decision, with Kadrmas's approval, to limit the number of employees with HUC credit cards to Kadrmas and the four division heads, including Spethman. On October 22, 2002, Smutka was in the HUC break room with other employees, including a division head named Don Nelson. Smutka learned that a subordinate had tried to use Smutka's HUC credit card, with Smutka's approval, but the card had been declined. Embarrassed because he was unaware of the card's cancellation, Smutka reacted with a loud and profane outburst against Spethman, allegedly making the following comments: "That God damned Patrick. Why the fuck doesn't he tell me these things?"; "Jesus Christ that God damned Patrick."; "Patrick thinks he's a manager, he's not. He's not even a human being. He's not God damned God."; "He's not a fucking manager."; "Patrick is fucking incompetent."; "Patrick should go back to wherever the fuck he came from."; "Thirty-four years as a loyal employee and this is the fucking way I'm treated."; and "You might as well give the fucking card back to Patrick." HUC Hearing Decision at 1 (finding of fact 3). Nelson reported Smutka's conduct to Sifferath. At a meeting with Sifferath the next day, Smutka said that the credit-card issue was "the straw that broke the camels [sic] back." E-mail of Oct. 24, 2002, from Sifferath to Spethman. First-hand accounts placed the length of Smutka's tirade from forty-five seconds to ten minutes, with Nelson saying the outburst lasted ten minutes.

Kadrmas and Spethman were out of town when the incident occurred, but both men were later notified of it. Although the HUC commissioners had delegated authority for personnel matters to Kadrmas, Spethman took it upon himself to ask

Sebora to investigate the break-room incident. Sebora assigned the City's Human Resources Director, Brenda Ewing, to conduct the investigation. Both Sebora and Ewing met with Smutka on October 24, 2002, informing him of the allegations about the break-room incident, what his rights were, and that he would be suspended with pay for five days pending the outcome of the investigation. Smutka responded that he had been upset when he learned about the declined credit card, but he denied making all of the statements attributed to him. Over the next few days, both Sebora and Ewing met with the employees present in the break room at the time of Smutka's outburst. On October 30, 2002, Sebora and Ewing met with Smutka and his attorney about the misconduct allegations. When given an opportunity to respond, Smutka remained mute, but his attorney stated that Smutka was upset about his diminished job responsibilities, that Smutka denied making all of the profane statements attributed to him, and that the attorney would submit a written response to the allegations by November 1, which he did.

On October 30, the HUC commissioners had a regularly scheduled meeting. Before the meeting, Sebora told Lenz that Smutka's employment should be terminated. Spethman met with Lenz and Wetterling before the meeting to discuss the incident. Spethman told them that he did not believe that Kadrmas would appropriately discipline Smutka given the lax discipline for the pornography incident. After the regularly scheduled meeting, the commissioners had a closed-door session to discuss Smutka's outburst. Although Kadrmas told the commissioners that Smutka's employment should not be terminated, the commissioners unanimously voted to terminate Smutka's employment and directed Kadrmas to do so. During their deliberations concerning the break-room incident, the commissioners discussed the pornography incident and two of the commissioners stated that Smutka's employment should have been terminated at that time. Kadrmas never authorized the break-room investigation; instead, he wanted to perform his own investigation. Because Kadrmas returned from an out-of-town trip on the day of the commissioners' meeting, he did not have the chance to perform his own investigation.

-4-

Sebora and Ewing met with Smutka and his new attorney, Ian Laurie, on November 4, 2002. Sebora and Ewing delivered a letter signed by Kadrmas terminating Smutka's employment "for just cause due to misconduct including . . . [u]sing abusive language or making false or malicious statement[s] concerning any employee," "conduct unbecoming [an HUC] employee," "[g]ross insubordination," and "[v]iolation of a major work rule." Letter of Nov. 4, 2002, from Kadrmas to Smutka. The letter further stated that the just-cause termination was supported by Smutka's "statements about and towards Patrick Spethman that are considered derogatory, abusive, included profanity, and exhibited gross insubordination." Id. The letter also notified Smutka of his appeal rights. The letter did not mention the pornography incident or that HUC had ordered Kadrmas to terminate Smutka's employment.

On November 6, 2002, Laurie filed a grievance on Smutka's behalf alleging wrongful termination. HUC held a hearing on November 22, 2002, and gave Sebora and Laurie opportunities to argue their respective positions. For health reasons, Smutka did not attend the hearing. HUC upheld the termination.

On September 11, 2003, Smutka exercised his rights under the Minnesota Public Employee Labor Relations Act (MPELRA), Minn. Stat. § 179A.25 (2002), and petitioned the Bureau of Mediation Services (BMS) for independent review of the termination. In June and July 2004, a BMS hearing officer held a trial-like hearing over four days and allowed the parties to submit post-hearing briefs. While concluding that "Mr. Smutka did engage in a profanity-laced diatribe against Mr. Spethman," Decision and Award at 24, the hearing officer still concluded that just cause did not support the termination and that HUC did not follow its policies in terminating Smutka's employment. The hearing officer ordered HUC to make Smutka whole by restoring his "employment without delay" and by "reimburs[ing] him for all lost wages and benefits resulting from his wrongful termination." Id. at 38. Smutka's effective date of reinstatement was December 1, 2004.

On October 16, 2003, shortly after Smutka filed his BMS petition, he brought this lawsuit alleging that he was denied his procedural-due-process rights under the Fourteenth Amendment. Although Smutka has been restored to his position with full backpay and benefits, he seeks nominal damages, attorney fees, and damages for personal injury and distress. The District Court granted summary judgment to the defendants. On appeal, Smutka contends that HUC violated his pre-termination procedural-due-process rights because HUC failed to inform him that the commissioners considered the pornography incident when discussing termination, HUC informed Smutka that the outburst lasted ten minutes but had not told him that others had said that the outburst was much shorter, and HUC said that Kadrmas made the termination decision when in fact the commissioners made the decision. Smutka also contends that his post-termination hearing before HUC violated his procedural-due-process rights. Finally, Smutka argues that the BMS hearing does not insulate HUC from liability for violating Smutka's procedural-due-process rights.

## II.

We review de novo the district court's grant of summary judgment to the defendants. Mayer v. Nextel W. Corp., 318 F.3d 803, 806 (8th Cir.), cert. denied, 540 U.S. 823 (2003). Summary judgment is proper only if the evidence, viewed in the light most favorable to Smutka and giving him the benefit of all reasonable inferences, shows that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

The United States Constitution states, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To succeed on his procedural-due-process claim, Smutka must satisfy a two-step test. Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902 (8th Cir. 2000). First, Smutka must show that HUC deprived him of a property interest. Id. It is undisputed that Smutka had a property interest in his continued employment and that HUC

-6-

deprived Smutka of that interest by terminating his employment. Thus, we proceed to the second step of the analysis and consider whether Smutka has established that HUC deprived him of his property without due process. See id.

Due-process requirements are met when a public employer provides a tenured public employee with appropriate pre-termination and post-termination proceedings. Before a public employer may lawfully terminate a public employee's employment, thereby depriving the employee of a property right to continued employment, the employer must provide the employee with appropriate notice and an opportunity to be heard. Id. Not surprisingly, the Supreme Court in Cleveland Board of Education v. Loudermill recognized that "[d]ismissals for cause will often involve factual disputes." 470 U.S. 532, 543 (1985). Thus, any pre-termination proceeding does not need to "definitively resolve the propriety of the discharge" but should simply provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545–46. To satisfy minimal due-process requirements at the pre-termination stage, a public employer must give the public employee "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546 (citations omitted).

We conclude that the District Court correctly determined that Smutka's pre-termination proceedings were constitutionally sufficient. HUC notified Smutka of the misconduct charge arising out of his profanity-laced tirade against Spethman. Although the pornography incident was discussed at the commissioners' meeting, it was not a new charge of misconduct against Smutka. The only misconduct listed in the termination letter was Smutka's outburst against Spethman. The fact that Sebora, Spethman, and two commissioners believed that Smutka got off easy on the

pornography charge does not mean that the pre-termination proceedings violated Smutka's procedural-due-process rights on the 2002 misconduct charge. Cf. Riggins v. Bd. of Regents, 790 F.2d 707, 711 (8th Cir. 1986) (holding that a public employee's procedural-due-process rights were not violated by the state's failure to give proper notice that prior work history would be considered in termination decision because employee's work history was "a minor part" in the termination decision and the employee had received adequate notice that "the ultimate reason for her discharge was her insubordination").

We also conclude that HUC adequately explained the evidence surrounding the break-room incident to Smutka. Although Smutka contends that he did not know that two employees said the tirade lasted only a minute or so, this contention lacks merit. Smutka was present, of course, during his outburst and knew enough about the incident to prepare a response. He did not need to be told how long his tirade lasted in order to prepare a defense to the charge of misconduct. Moreover, HUC "was not required to provide [Smutka] with a full [pre-termination] hearing, nor was [HUC] required to disclose all of the details of the charges." Schleck v. Ramsey County, 939 F.2d 638, 642 (8th Cir. 1991). Smutka also maintains that he had the right to know that Kadrmas did not decide to terminate Smutka's employment but rather was instructed to do so by HUC. This contention lacks legal support, and we conclude that nothing in Loudermill suggests that HUC was required to provide this type of pre-termination notice to Smutka. Finally, we conclude that Smutka had sufficient opportunity to respond to the misconduct charge. In fact, he enjoyed two separate opportunities—one with the assistance of counsel—to present his side of the story.

Although HUC certainly could have done more in the pre-termination proceedings, it was not required to do more. Smutka's extensive and comprehensive post-termination proceedings further compel our conclusion that HUC did not violate Smutka's procedural-due-process rights. For support, we repeat what we wrote in Krentz: "Ultimately, our conclusion that [the employee] received adequate

pretermination process depends heavily upon the fact that robust post-termination proceedings may cure superficial pretermination proceedings." 228 F.3d at 903.

Turning to the post-termination proceedings, we note that Smutka essentially argues that we must consider his pre- and post-termination proceedings as wholly distinct and separate events when considering the ultimate procedural-due-process question. We disagree. The Eighth Circuit has "interpreted Loudermill to require only limited pretermination process, especially if post-termination proceedings are available and extensive." Id. at 902–03. We have further explained, "[E]xtensive post-termination proceedings may cure inadequate pretermination proceedings." Id. at 902. Smutka mistakenly contends that we must review only the HUC hearing—without reference to the BMS hearing—when determining the adequacy of his post-termination proceedings. Because that contention is not the law, cf. id. at 903 (recognizing that Missouri law granting an administrative hearing constitutes post-termination proceedings that satisfy due-process requirements), we ask whether the BMS hearing violated Smutka's procedural-due-process rights. It cannot be seriously doubted that the MPELRA's independent review process provided Smutka with comprehensive post-termination rights. See Minn. Stat. § 179A.25. Under those post-termination proceedings, Smutka enjoyed a full, trial-like, four-day hearing before an independent review officer and also had the opportunity to submit post-hearing briefs. These post-termination proceedings resulted in reinstatement with full backpay and benefits. Given Smutka's access to extensive post-termination proceedings, we must sustain the District Court's conclusion that Smutka's procedural-due-process rights were not violated in this case.

## III.

For the reasons discussed, we affirm the District Court's grant of summary judgment to the defendants.

_____